Argued and submitted July 27, 2017, affirmed November 6, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICHARD BRIDGEMAN GUSTAFSON,
*Defendant-Appellant.*

Deschutes County Circuit Court
14FE0032; A159489

452 P3d 962

In this criminal case, defendant appeals from a judgment convicting him of, among other things, 21 counts of first-degree encouraging child sexual abuse. Defendant assigns error to the trial court's denial of his motion to suppress the evidence supporting those convictions, which was found on two computers seized pursuant to a search warrant. Defendant asserts, among other challenges, that the warrant was not supported by probable cause. *Held*: The affidavit provided probable cause to believe that evidence of sexual abuse would be found on defendant's computers.

Affirmed.

Wells B. Ashby, Judge.

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Richard Bridgeman Gustafson filed the supplemental brief *pro se.*

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Hadlock, Judge pro tempore.

POWERS, J.

Affirmed.

**POWERS, J.**

In this criminal case, defendant appeals from a judgment convicting him of 11 counts of first-degree sexual abuse, ORS 163.427; 21 counts of first-degree encouraging child sexual abuse, ORS 163.684; and one count of possession of cocaine, ORS 475.884. Defendant assigns error to the trial court's denial of his motion to suppress the evidence supporting his convictions for encouraging child sexual abuse, which was found on two computers seized pursuant to a search warrant.[1] Defendant asserts, among other challenges, that the warrant was not supported by probable cause.[2] We conclude that the affidavit provided probable cause to believe that evidence of sexual abuse would be found on defendant's computers. Accordingly, we affirm.

The warrant at issue on appeal is the second warrant issued during the investigation of defendant. The relevant facts are those recited in the affidavit of Bend Police Officer Russell, which was submitted in support of the application for that warrant. *See State v. Webber*, 281 Or App 342, 343, 383 P3d 951 (2016) (relevant facts are those recited in the affidavit).

The affidavit recites information about allegations by four young girls that, during sleepovers at Acrovision Sports Center in Bend, defendant, a gymnastics coach at Acrovision, had touched them inappropriately. The first two victims disclosed the touching to their parents on January 1, 2014, shortly after coming home from a New Year's sleepover.

---

[1] We reject without discussion defendant's other assignments of error, including those he raises in a *pro se* supplemental brief.

[2] Defendant also argues that the warrant did not comply with the requirements that the Supreme Court established in *State v. Mansor*, 363 Or 185, 421 P3d 323 (2018), for warrants to search electronic devices based on the concepts of specificity and overbreadth, which inform the analysis of whether a warrant is sufficiently particular under Article I, section 9, of the Oregon Constitution. We conclude, however, that defendant did not preserve that argument. Although defendant characterized the warrant as "overly broad" in his argument before the trial court, he used that term to summarize his argument that there was no probable cause to seize any of his computers; he did not challenge the warrant as insufficiently particular. As explained below, we understand defendant's argument both before the trial court and on appeal as one that asserts there was no probable cause to search any device, not one asserting that the warrant allowed the search of too many devices.

They were interviewed at the KIDS center, a child abuse intervention center, and recounted the following information. At the sleepover, defendant slept upstairs in the loft area of Acrovision with a group of around 12 children. He invited the victims to sleep upstairs. During the night, defendant pulled one victim out of her sleeping bag and pulled her on top of his chest. When she tried to move off of him, he pulled her back onto him, and he kissed the top of her head. He also lay down next to another victim and touched her under her clothing on her breasts and vagina.

A few days later, the mother of the first victim made a recorded telephone call to defendant, during which he denied that he had slept in the loft area; he said that he had slept in his office, which was also upstairs at Acrovision. Less than an hour after the recorded telephone call, defendant called the first victim's mother back. He told her that the children had chosen where they slept during the sleepover. He also said that he had fallen asleep in the main area upstairs, not his office, and that there were no children there when he fell asleep. He said that, later, he had woken up surrounded by children and moved to his office. He also said, referring to the sleepovers, "We've done this for years."

While collecting the victims' clothing and sleeping bags as evidence, Russell learned that one of the victims had smelled like men's cologne when she returned from the sleepover.

Russell and another officer spoke with defendant, first at Acrovision and then at the police department, on January 8, 2014. Defendant said that approximately eight children had slept in the loft during the sleepover and that he had fallen asleep around 12:30 a.m. in the main area of the loft with no children around him. He woke up at 4:00 a.m. and found that there were eight or nine children sleeping in the area, at which point he moved to his office. Later in the morning, after 7:00 a.m., he went to the restroom and lay down with the children upon his return. Russell arrested defendant on charges of first-degree sexual abuse and coercion.

A few days later, two more victims came forward and were interviewed at the KIDS center. They recounted the following information. Defendant touched the first of the two during a sleepover at Acrovision around Halloween 2013. She was one of the children that was picked to sleep upstairs during that sleepover. During the night, defendant put his hand down her pants and "humped" her through her sleeping bag, and he also touched other girls who were sleeping upstairs. The second victim attended a sleepover at Acrovision in 2012. Defendant invited her to sleep upstairs. During the night, defendant startled her by breathing in her ear and then rubbed her leg from bottom to top.

Russell also interviewed a former employee of Acrovision who had been employed there as receptionist between 2002 and 2005. She reported that, while she worked at Acrovision, there was a desktop computer set up just outside defendant's office in the loft area. Employees were allowed access to the computer. Defendant's wife discovered pornography on the computer, and defendant blamed it on two staff members. The staff members were upset because they were not responsible for it. Other employees took that computer home to do video splicing, but they quickly returned it because there was pornography popping up on it continually. Defendant said that the pop-ups were created by a service called Limewire, which he had used to download music.

The former employee also told Russell the following:

"[O]nce she heard about the 'Limewire' excuse [defendant] had given she became increasingly curious and went upstairs to check the computer out for herself. [She] told me she has illegally downloaded music from Limewire and never had an issue with pornography popping up after using the service. While checking the computer's files and internet browsing history out she located some photographs which were saved in a file on the desktop of the computer. The photographs were of young girls dressed in leotards. [The employee] said the photos concerned her because they did not show the gymnast's face and started at the shoulders and went only down to the knees. [She] said the girls had 'very tight' leotards on that were cut very high on the hips. [The employee] said that it then dawned on her that

defendant could have been taking photos of the girls at the gym and cropping their heads and legs out of the photos for his own sexual pleasure. [The employee] told me [defendant] was always taking photos and videos of the gymnasts at Acrovision and she always assumed it was for business promotion purposes."

Russell averred that he knew that Limewire is a peer-to-peer network and that peer-to-peer networks "are most commonly used by people downloading child pornography." He also averred that he knew, based on his training and experience, "that people who are involved in the sexual abuse of children have almost always began [*sic*] their addiction by viewing child pornography. I also know people involved in the sexual abuse of children continually feed their addiction by viewing child pornography."

Finally, the affidavit recounted the content of telephone calls that defendant made to his wife from jail. During the first call, defendant's wife told him that the police had taken computers from Acrovision (during the execution of the first warrant, which is not at issue on appeal). Defendant asked her if they had taken his laptop, and she responded that his laptop case was still there. During another call two days later, defendant asked his wife to "make sure the computer at the gym can be at home so I can make sure I have it when I get out so I can be able to get all the taxes done."

Based on the affidavit, a magistrate issued a warrant that authorized the police to search defendant's home and Acrovision, as well as two vehicles, for, as relevant here, "[u]nknown brand laptop with or without a laptop case used by [defendant];" "[p]hotographs of young girls in leotards, specifically cropped photos from the subject's neck to their knees;" and "[s]till photo cameras requiring film, digital still photo cameras, digital video recorders, video recorders requiring tapes, other media storage devices capable of storing digital photos and video recordings of female gymnasts in leotards."

Pursuant to that warrant, the police seized, among other things, a desktop computer from defendant's home and his laptop from Acrovision. During subsequent searches of the two computers, officers found the files that formed

the basis for the charges of encouraging child sexual abuse.[3] Eleven of those files were on the laptop, and 11 were on the desktop. The two sets of files were the same, and one set could have been copied from the other. The files had "last accessed" and "last modified" dates showing that they had been created and viewed at different times on the two computers.

Before trial, defendant sought suppression of the items seized during and evidence derived from the execution of the second warrant.[4] In a written opinion, the court held that the images described by the former employee—cropped images of the torsos of young gymnasts wearing very tight, high-cut leotards—were subject to seizure even though the pictures were not unlawful in and of themselves. The court considered the age of the former employee's information in a "staleness" analysis and concluded that, even though the information was old, it could still be relied on by a magistrate to support probable cause. The court ultimately held that there was probable cause to believe that evidence of sexual abuse would be found on the digital devices identified in the warrant.

On appeal of his subsequent convictions, defendant contends that the affidavit does not demonstrate that there would probably be material subject to seizure on defendant's digital devices. Specifically, he contends that (1) the information provided by the former employee is too old to establish probable cause to believe that there would be seizable material on devices he owned when the warrant issued and (2) Russell's averments based on his training and experience do not provide probable cause. Defendant does not challenge the reliability of the information recounted in the affidavit. Defendant also does not argue

---

[3] After they initially found evidence of child pornography on the laptop, the officers obtained another warrant—the third warrant of the investigation— to allow the search of both computers. Defendant did not raise any argument regarding that warrant before the trial court and, likewise, it is not at issue on appeal.

[4] Defendant initially challenged the first warrant. During the hearing, he asked the court to consider his motion to apply to the second warrant instead, because that warrant was the one that yielded the evidence. The court agreed to do that, and, as explained below, it analyzed the facts regarding the second warrant in its written opinion.

that, even if the search of some of his electronic devices was supported by probable cause, the warrant nevertheless allowed the search of too many devices. That is, defendant's argument—both below and on appeal—is that there was no probable cause to search *any* device, and that the trial court erred in concluding otherwise. Defendant does not dispute that items "probative of defendant's sexual interest in children" were properly subject to seizure under these circumstances.

In reviewing a trial court's determination that there was probable cause to issue a warrant, "we examine the facts in the supporting affidavit in a commonsense, non-technical and realistic fashion, looking at the facts recited and the reasonable inferences that can be drawn from those facts." *State v. Chase*, 219 Or App 387, 391-92, 182 P3d 274 (2008) (internal quotation marks omitted). Our task is "to determine, as a matter of law, whether [the affidavit] permits a conclusion by a neutral and detached magistrate that the items specified in the warrant will probably be found in a specified place to be searched." *Id.* at 392 (internal quotation marks omitted). Our standard of probability "requires less than a certainty, but more than a mere possibility" that the items will be found in one of the specified places. *Id.* Finally, in adhering to the probable cause requirement, "we resolve doubtful or marginal cases in favor of the preference for warrants." *State v. Henderson*, 341 Or 219, 225, 142 P3d 58 (2006).

We begin by considering Russell's averments that "people who are involved in the sexual abuse of children have almost always began [*sic*] their addiction by viewing child pornography" and that "people involved in the sexual abuse of children continually feed their addiction by viewing child pornography." Although knowledge based on a law enforcement officer's training and experience is among the circumstances that we consider in evaluating probable cause, we have noted that "we must not only ensure that the officer's knowledge is connected to the facts of a particular case; we must also examine the knowledge itself." *State v. Daniels*, 234 Or App 533, 540, 541, 228 P3d 695, *rev den*, 349 Or 171 (2010).

As the information that the officer provides "becomes more esoteric, specialized, counter-intuitive, or scientific, increasingly persuasive explanation is necessary. The extent to which an officer must explain the basis of his or her 'training and experience' knowledge, in other words, varies from case to case across a broad spectrum." *Id.* at 542. Some knowledge is so common that little or no training or experience is necessary to support it. *Id.* (explaining that, at one end of the spectrum, knowledge that "a person who stole property is likely to keep it at his or her home" requires no support). Esoteric, specialized, counter-intuitive, or scientific knowledge "requires more of a foundation than the bare assertion of training and experience." *Id.* (providing, as an example of such specialized knowledge, "the fact that anhydrous ammonia is a precursor chemical used in the manufacture of methamphetamine and that a brass fitting that has been in contact with that substance will turn blue").

Here, the affidavit recites that Russell has been a police officer for nine years, has received more than 1,827 hours of specialized training—but not the topics of that training—and, during his employment as a police officer, has "personally conducted investigations in the area of Sexual Abuse involving minors." We question whether that recitation adequately supports his averments about the relationship between child sexual abuse and child pornography, which are assertions of specialized knowledge about what sexual abusers "almost always" and "continually" do. Russell's recitation of his training identifies no training in the habits of sexual abusers, and his recitation of his experience investigating sexual abuse of children does not suggest that he would have gained detailed knowledge of the relationship between child sexual abuse and child pornography from numerous or in-depth investigations. *Cf. Daniels*, 234 Or App at 541-43 (averment that pedophiles often own and retain deviant movies was sufficiently explained by the officer's 24 years of law enforcement experience, advanced training in sexual abuse of children, familiarity with the methods of operation of people committing those crimes, investigation of numerous allegations of sexual abuse of children while working at several different law enforcement agencies, and interviews of numerous child victims and perpetrators).

However, we need not, and do not, decide whether Russell's averments about the habits of sexual abusers of children contribute to the probable cause determination. That is so because, as explained below, we conclude that, even in the absence of those averments, the affidavit provided probable cause to believe that photographs or videos demonstrating defendant's sexual interest in children would be found on his digital devices.

We begin from the proposition, which, as noted above, defendant does not challenge, that items probative of defendant's sexual interest in children are among the items that could be seized pursuant to a warrant under these circumstances. Likewise, defendant does not dispute that the photographs of the torsos of young gymnasts in very tight, high-cut leotards are such items. The former employee's information demonstrated that those items existed in the past. She also provided the information that defendant had frequently photographed and videotaped gymnasts at Acrovision in the past.

Defendant contends that information from which a magistrate could infer that he had photographed gymnasts at Acrovision and cropped those photographs in a way that allowed him to use them for sexual pleasure between 2002 and 2005 did not give rise to probable cause to believe that items probative of defendant's sexual interest in children would be on his laptop or digital devices in early 2014. He contends that nothing in the affidavit allows an inference that defendant still owned the same computer or that he would have transferred the photos of the gymnasts to any new computer.

When an affidavit contains information about circumstances that existed in the past, we must determine "whether, given the time between the event described [in the affidavit] and the issuance of the warrant, there is a reasonable inference that the evidence will be where the affidavit suggests." *State v. Young*, 108 Or App 196, 204, 816 P2d 612 (1991), *rev den*, 314 Or 392 (1992). That evaluation "depends upon all the circumstances." *State v. Kirkpatrick*, 45 Or App 899, 903, 609 P2d 433, *rev den*, 289 Or 337 (1980). We generally consider five factors to assist with that evaluation:

"(1) the length of time; (2) the 'perishability' versus the durability of the item; (3) the mobility of the evidence; (4) the 'nonexplicity inculpatory character' of the evidence; and (5) the 'propensity of an individual suspect or general class of offenders to maintain and retain possession of such evidence.'" *State v. Van Osdol*, 290 Or App 902, 909, 417 P3d 488 (2018) (quoting *State v. Ulizzi*, 246 Or App 430, 438-39, 266 P3d 139 (2011), *rev den*, 351 Or 649 (2012)).

Here, the length of time between the former employee's discovery of the photographs of gymnasts and the issuance of the warrant is long—approximately 10 years. In some circumstances, that lapse of time would prevent a determination of probable cause. *See, e.g.*, *State v. Corpus-Ruiz*, 127 Or App 666, 670, 874 P2d 90 (1994) (information that a suspect had used heroin at a house six months before the warrant was issued did not give rise to probable cause to believe that heroin would still be at the house at the time of issuance). As noted above, however, the analysis is entirely circumstance specific and the goal is to ascertain whether it is reasonable to infer that the items, or, in this case, the same or similar items, will probably be found in the specified place.

Considering the second, third, and fifth factors together, we conclude, as explained below, that digital photographs are durable and, although they are mobile, in this case, that mobility was likely limited to the devices encompassed in the warrant. Moreover, and most importantly, although we do not consider any express statements about the propensity of individuals like defendant to keep that type of evidence, the totality of the circumstances here allows a strong inference that defendant would have kept the photographs or created more similar evidence.

Before turning to those factors, however, we briefly note that we conclude that the fourth factor, whether the evidence was explicitly inculpatory, is not particularly helpful to our analysis here. The reasoning behind that factor is that, if the evidence is not explicitly inculpatory, an actor may be more likely to keep it. *See Ulizzi*, 246 Or App at 438-39 (citing cases to that effect). Here, the photographs that the employee saw were not explicitly inculpatory—they could be

passed off as related to publicity photos for the business—but they did allow a viewer to infer, like the former employee did, that defendant was sexually interested in young gymnasts. Given the nature of the photographs in this case, the fourth factor is not helpful to our analysis.

We return to our consideration of the second, third, and fifth factors, beginning with the second and third—the perishability of the evidence and its mobility. Although, as defendant points out, the affidavit lacks information describing typical computer use, that does not preclude drawing inferences from the affidavit that are a matter of common sense. *See Henderson*, 341 Or at 225 ("[E]ven without [the affiant's] statements about his experience, we think that the magistrate could rely on his own common sense and draw reasonable inferences from [the affiant's] information about the rings and about defendant."). As the trial court noted, digital photographs are inherently durable, as opposed to perishable or subject to being used up, like user amounts of drugs. *Compare id.* (observing that diamond rings are "nonperishable items of high value that would be easy to conceal, that retain their value, and that some people might find attractive to keep for personal use") *with Corpus-Ruiz*, 127 Or App at 670 ("Heroin is a substance that has a relatively long shelf life, but can be consumed in a short period of time and is easily moved.").

It is true that, as defendant points out, the affidavit does not reveal whether defendant still owned the same computer that he had when the former employee saw the photographs, and the computer on which the former employee had found the photographs was a desktop, while the warrant included defendant's laptop. It is also true, however, that digital photographs can be copied from one device to another. Although Russell did not specifically aver as much in his affidavit, that type of knowledge is a matter of common sense. *See Henderson*, 341 Or at 225 (noting that a magistrate can "rely on his [or her] own common sense and draw reasonable inferences" about where the defendant would probably keep the evidence). Thus, we need not assume that, merely because the electronic devices to be seized in the search may not include the one on which the

employee saw the photographs, the photographs themselves must have been discarded or deleted.

Digital data is certainly mobile evidence, a fact that generally weighs against continuing probable cause. Under these particular circumstances, however, we conclude that the mobility of the photographs is probably limited to the group of devices of which the warrant allowed a seizure: media storage devices at defendant's home or workplace or in his vehicles that are "capable of storing digital photos and video recordings of female gymnasts in leotards." That is, if defendant moved the photographs, it was likely only to another of his devices. Thus, despite their mobility, the photographs, if defendant retained them, were likely to be found in one of the places to be searched.[5]

Considering it, as we are, without Russell's averments based on his training and experience, the affidavit lacks information about the fifth factor, the propensity of individuals like defendant to keep that type of evidence. However, it is possible to draw inferences from facts in the affidavit itself about the likelihood that evidence will be kept. *See Henderson*, 341 Or at 225.

Here, the facts in the affidavit allow a strong inference that defendant would have kept the photographs or produced more: The photographs evidenced defendant's sexual attraction to young gymnasts between 2002 and 2005 and show that, at that time, he used his business as a means of obtaining access to gymnasts for sexual purposes. The affidavit contains abundant information, in the form of multiple allegations of sexual abuse at Acrovision, that allow an inference that, when the warrant issued, defendant was still sexually attracted to young gymnasts and that he continued to use his business as a means of obtaining access to them. The information in the affidavit, taken together and including defendant's statement that he had run sleepovers at the gym "for years," permits an inference that defendant's use of his business for access to young gymnasts at Acrovision

---

[5] As noted above, defendant does not argue that the warrant allowed the seizure of too broad a group of devices, and he did not preserve any challenge under *Mansor*. We express no opinion on whether the same analysis would apply if defendant had raised either of those arguments.

for sexual purposes continued from the time the former employee found the photographs until the warrant issued. And defendant's concern about his laptop, expressed to his wife in the jail phone calls, suggests that his continuing use of his business to allow him access to gymnasts for sexual purposes still included his computers as well. Given all of that, a magistrate could infer that, despite the time between the employee's viewing of the photographs and the issuance of the warrant, defendant's computers would still contain the same or similar photographs.

Because the information in the affidavit demonstrated that seizable things would probably be found on defendant's digital devices, the trial court did not err in denying defendant's motion to suppress.

Affirmed.