Argued and submitted July 21, 2009, affirmed March 31, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MARVIN JAMES DANIELS,
*Defendant-Appellant.*

Curry County Circuit Court
07CR0300; A136819

228 P3d 695

Clayton C. Patrick argued the cause and filed the brief for appellant.

Rene C. Holmes, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Schuman, Judge.

SCHUMAN, J.

## SCHUMAN, J.

After the court denied defendant's motion to suppress evidence that police seized from his residence pursuant to a search warrant, defendant was tried on stipulated facts and convicted of six counts of encouraging child sexual abuse in the second degree, one count of invasion of privacy, and one count of sexual abuse in the third degree. The motion to suppress was based on defendant's argument that the application for the warrant did not contain facts that were sufficient to justify a search for incriminating photographs and videotapes. He renews that argument on appeal. We affirm.

The warrant at issue was based on the affidavit of Creighton, the Port Orford Chief of Police. In the affidavit, Creighton related that he had received a telephone call from a concerned police detective in Montana. The detective told him that she had recently learned that, some 20 years earlier, defendant had sexually abused his adopted daughter and that defendant was now living with a young female foster child.

After confirming that the person with whom he had been talking was, indeed, a Montana detective, Creighton conducted telephone interviews with the adopted daughter, P, and with defendant's biological daughter, K. Both of the women told the officer that defendant had sexually abused them between 1975 and 1986, when they were young girls. P also reported that defendant had raped her in 1990, when she was in college. Creighton asked P if defendant had ever videotaped any of the abuse or if she had ever seen pornographic or other sexually explicit videotapes in defendant's possession. P stated that, to her knowledge, defendant had not had any videotapes or photographs but that, on one occasion, he did attempt unsuccessfully to videotape a sexual act with her.

Creighton's affidavit also related information that he had received from D, the brother of the foster daughter, A, who was living with defendant. D, too, had lived with defendant at one time, but had moved away nine months earlier. The affidavit related:

"[D] informed me that when he was last living there sometimes at night after [defendant] sent the boys to bed that he would sneak a peek into the living room from his room. He said that during regular occurrences he could see [defendant] massaging [A] on the living room floor and the living room couch. He said that [A] was always clothed in a pant type pajama outfit.

"[D] said that he would observe [defendant] kneeling over [A] massaging her intimate parts including her vaginal area. Based on information provided to me by the Department of Human Services [A] would have been 13 years old when [defendant] touched her vaginal area. [D] indicated to me that he last saw [defendant] touching [A] in May of 2006 [nine months ago]. [D] also stated that [A] and [defendant] would be locked inside the bathroom together, or in the bedroom and that sometimes he ([D]) would knock on the door to irritate [defendant] and [defendant] would yell at him to stop."

Creighton attached transcripts of his interviews with P, K, and D to the affidavit. He requested authorization to search defendant's residence and seize evidence containing DNA from defendant and the foster child, as well as any photographs, videotapes, or recording devices that likely contained illegal material. To justify the scope of the requested search and seizure, he explained that, based on his "training and experience,"

"I know that pedophiles have methods by which they entice and encourage children to engage in sexual conduct, and they exchange experiences, photographs with each other and make contact with other adults whom engage in similar conduct.

"* * * * *

"I know that pedophiles often retain correspondence, photographs, diaries, magazines and movies in reference to their deviance. This retention of information may span several years and the material is sometimes used to lower a child's inhibition and to re-live the pedophile experience.

"* * * * *

"Pedophiles rarely dispose of their sexually explicit material and or correspondence, especially when it's used in the seduction of their victim."

Creighton stated that his "training and experience" consisted of 24 years as a law enforcement officer and 35 hours of "advanced training and expertise in sexual abuse crimes, in which children are victimized."

The court issued the search warrant. Officers subsequently searched defendant's house and found videotapes that contained, among other things, children engaging in sexually explicit conduct and images that defendant had surreptitiously recorded through his bathroom window showing nude young girls. Defendant was indicted on 33 counts of encouraging child sexual abuse in the second degree, ORS 163.686; two counts of invasion of privacy, ORS 163.700; and one count of sexual abuse in the third degree, ORS 163.415.

Defendant filed a motion to suppress all of the items that were seized pursuant to the search warrant, arguing that the affidavit and exhibits did not state facts that were sufficient to enable a neutral and detached magistrate to determine that there was probable cause to believe that the incriminating items specified in the search warrant would be found at defendant's residence. The court denied the motion. Pursuant to a plea bargain, a stipulated facts trial ensued. Defendant was convicted of six counts of encouraging child sexual abuse in the second degree, one count of invasion of privacy, and one count of sexual abuse in the third degree. This appeal followed.

At the outset, we must clarify the scope of the appeal. Although defendant moved for the suppression of all evidence derived from the warrant, his argument on appeal focuses exclusively on the videotapes, presumably because those items were the only incriminating evidence that police found. The question on appeal, therefore, is whether the court erred in authorizing the search for and seizure of the videotapes. We need not and do not reach the question whether the affidavit and exhibits were sufficient to justify authorizing police to search for and seize other items. That issue would arise in only two situations, neither of which is presented here: first, if the other seized items were incriminating and defendant argued for their suppression; and second, if there were an argument or evidence that the police lawfully entered the residence and seized the videotapes

because they were in plain view and revealed incriminating contents without further investigation.

██ With that focus in mind, we turn to the question whether the court erred in authorizing the search for, and seizure of, the videotapes. A judge may issue a search warrant if, after reviewing an application and supporting affidavit, the judge finds that "there is probable cause to believe that the search will discover things specified in the application and subject to seizure." ORS 133.555(2); *see also* Or Const, Art I, § 9.[1] "Probable cause" is a more rigorous standard than mere suspicion; even a well-warranted suspicion does not suffice, because "a suspicion, no matter how well founded, does not rise to the level of probable cause." *State v. Verdine*, 290 Or 553, 557, 624 P2d 580 (1981). At the same time, "there is a vast difference between proof of probable cause and proof of guilt * * *." *State v. Tacker*, 241 Or 597, 600, 407 P2d 851 (1965).

██ To determine probable cause, the judge may rely on facts asserted in the affidavit as well as reasonable inferences to be drawn from them. *State v. Anspach*, 298 Or 375, 381, 692 P2d 602 (1984); *State v. Howell*, 93 Or App 551, 557, 763 P2d 179 (1988), *rev den*, 307 Or 405 (1989). In reviewing a judge's determination that a warrant is supported by probable cause, we examine the information in the supporting affidavit in a "commonsense and realistic fashion." *State v. Villagran*, 294 Or 404, 408, 657 P2d 1223 (1983). Doubtful cases should be resolved in favor of allowing the warrant. *Tacker*, 241 Or at 602 (quoting *United States v. Ventresca*, 380 US 102, 109, 85 S Ct 741, 13 L Ed 2d 684 (1964)).

In the present case, the issuing judge had the following relevant information. According to defendant's daughters, defendant repeatedly sexually abused them when they were children, the last incident occurring in 1990 when the younger daughter was in college. On one occasion, one of the daughters recalled that defendant attempted to videotape the act, but the attempt was unsuccessful. Beyond that incident, neither daughter recalled any instances of videotaping,

---

[1] Article I, section 9, provides, in part, that "no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

nor did either recall that defendant possessed videotapes or photographs. No charges were ever filed against defendant for the acts involving the daughters.

For a period of time ending nine months before the warrant application, a male child living with defendant at the time had regularly witnessed defendant sexually abusing the boy's sister, then 13, by rubbing her crotch and vaginal area. Further, the boy recalled that defendant occasionally took the 13-year-old girl into the bathroom and bedroom, closed the door, and became angry when disturbed. The boy did not recall seeing pornographic videotapes or photographs.

Finally, the judge learned that the affiant, Creighton, had training and experience causing him to believe that pedophiles "often retain * * * movies in reference to their deviance," that the retention "may span several years," and that "pedophiles rarely dispose of their sexually explicit material."

We agree with the state that, even without the information supplied by Creighton based on his training and experience, the affidavit established probable cause to believe that *some* evidence of inculpatory sexual activity between defendant and his foster daughter—for example fluids on bedding or undergarments—would be found in defendant's residence. Such evidence, unlike drugs, is not consumable or marketable, nor is it likely to dissipate (DNA, for example, lasts for millennia); therefore, it is not necessarily "stale" after a short time. *See State v. Corpus-Ruiz*, 127 Or App 666, 670, 874 P2d 90 (1994) (staleness depends on the nature of the thing to be seized; item that can be consumed in short time becomes stale quickly); *State v. Kirkpatrick*, 45 Or App 899, 903, 609 P2d 433 (1980) (staleness is to be determined by the kind of evidence sought).

However, without the information derived from Creighton's training and experience, the affidavit is undeniably deficient with respect to the videotapes. It contains very old allegations of sexual abuse from two victims and a more recent allegation from a witness, but only one person recalled anything that is *per se* relevant to videotapes that could be evidence of the suspected crimes. That recollection was at

least 20 years old, and it involved only an unsuccessful attempt to create such material. Because of its age, its lack of corroboration, and its lack of anything connecting defendant to the actual creation or possession of inculpatory videotapes, that old information adds very little to the quantum of information relevant to the search for and seizure of that material. To link defendant to the inculpatory videotapes, an additional fact is necessary: that people who have at some point engaged in sexual abuse of children possess and retain videotapes of live children, unclothed or engaging in sexual acts. Without that fact, the affidavit creates at most a tenuous suspicion that defendant might possess illegal videotapes. As noted, however, mere suspicion is not enough. We must therefore consider the weight to be given to Creighton's training and experience information.

■  It is well settled that determinations of probable cause involve the totality of the circumstances in any given situation and that a law enforcement officer's training and experience are among the circumstances that can be considered. *E.g.*, *State v. Vasquez-Villagomez*, 346 Or 12, 23, 203 P3d 193 (2009). It is also well settled, however, that an assertion of "training and experience" is not enough by itself to create probable cause. *State v. Jacobs*, 187 Or App 330, 333, 67 P3d 408 (2003). In order for an attestation regarding training and experience to support probable cause, it must connect a defendant's particular conduct or circumstances with the specific evidence that police seek, and it must be supported by "objective facts derived from other sources." *State v. Goodman*, 328 Or 318, 328, 975 P2d 458 (1999). As we have explained, if an officer testifies that, for example, his training and experience have taught him that "paperfolds of a particular shape are often used for drugs," and the officer also testifies that "the defendant possessed a paperfold of that particular shape," the training and experience create "a basis to believe that the defendant's paperfold contained drugs." *State v. Miglavs*, 186 Or App 420, 432, 63 P3d 1202 (2003), *aff'd*, 337 Or 1, 90 P3d 607 (2004) (citing *State v. Herbert*, 302 Or 237, 242, 729 P2d 547 (1986)). Put another way, the training and experience information (paperfolds contain drugs) supplies the major premise on which the conclusion (defendant possessed drugs) depends, and that major premise must

be followed by a minor premise (defendant possessed a paperfold) that is supported by objective facts derived from other sources. *See id.* at 432 (describing connection between facts, training and experience, and conclusion as a syllogism).

In the present case, Creighton's affidavit states that, in his experience, pedophiles (that is, people who are sexually attracted to children) own and often retain "deviant" movies. That is the major premise. The affidavit also contains information that, as recently as nine months before the date of the warrant, defendant was seen in his home sexually abusing a child, and the child was still living there—in other words, that defendant is a person who is sexually attracted to children. That information is the minor premise, a fact supported by independent evidence (D's statement). Creighton's statements about his training and experience, therefore, adequately supply the necessary major premise that, along with the independent objective fact regarding defendant's conduct, logically leads to the conclusion: there are probably inculpatory videotapes in defendant's residence.[2]

That conclusion alone, however, does not mean that the affidavit was legally sufficient. A syllogism can be logical without yielding a true or dependable conclusion ("All automobiles have six wheels; my 2008 Honda is an automobile; therefore my 2008 Honda has six wheels."). The value of the conclusion depends on the accuracy of the major premise. In the context of statements regarding training and experience, that means we must not only ensure that the officer's knowledge is connected to the facts of a particular case; we must also examine the knowledge itself. The phrase "training and experience," in other words, is not a magical incantation with the power to imbue speculation, stereotype, or pseudoscience with an impenetrable armor of veracity.

In many cases, what the officer states that he has learned from training and experience reflects common sense—for example, that hunters keep their rifles at their

---

[2] Defendant does not argue that Creighton's training and experience are inadequate because he states that he has learned that pedophiles "often" retain inculpatory movies, and we therefore do not address that argument. *Accord State v. Harper*, 197 Or App 221, 229 n 3, 105 P3d 883 (2005); *State v. Keerins*, 197 Or App 428, 435, 106 P3d 166, *rev den*, 338 Or 681 (2005).

homes, *State v. Clapper*, 216 Or App 413, 422, 423-24, 173 P3d 1235 (2007), or that people who possess stolen property hide it in their homes or vehicles, *State v. Henderson*, 341 Or 219, 225, 142 P3d 58 (2006). However, as the information becomes more esoteric, specialized, counter-intuitive, or scientific, increasingly persuasive explanation is necessary. The extent to which an officer must explain the basis of his or her "training and experience" knowledge, in other words, varies from case to case across a broad spectrum. At one extreme is knowledge such as the fact that a person who stole property is likely to keep it at his or her home—knowledge that, in fact, need not be justified by *any* reference to training and experience. At the other end of the spectrum is knowledge such as, for example, the fact that anhydrous ammonia is a precursor chemical used in the manufacture of methamphetamine and that a brass fitting that has been in contact with that substance will turn blue. *See State v. Heckathorne*, 347 Or 474, 478, 223 P3d 1034 (2009). Knowledge at that end of the spectrum, in order to count in the magistrate's probable cause calculus, requires more of a foundation than the bare assertion of training and experience.

In the present case, Creighton provided the following details about his training and experience. After stating that he had 24 years of law enforcement experience, his affidavit continued:

> "Part of my duties as a police chief include the investigation of sex crimes, including, but not limited to, crimes committed against minor children. I have received approximately thirty-five hours of advanced training and expertise in sexual abuse crimes, in which children are victimized.

> "Additionally, I have had on the job experience in investigating sexual abuse crimes while employed with The City of Port Orford Police Department as well as several other agencies * * *. The training and experience that I've received in the course of my employment has familiarized me with the methods of operation of persons committing the crime of sexual abuse against children.

> "During my employment as a Law Enforcement Officer, I have investigated numerous sexual abuse allegations

involving the sexual exploitation of children. I have interviewed numerous children who have been victimized by sexual exploitation and furthermore, I have conducted numerous interviews of perpetrators involved in the sexual exploitation of children."

It is true that, in several particulars, this recitation could provide more detail to demonstrate the value of Creighton's training and experience. Did the 35 hours of advanced training include studies or other documentation about the habits of pedophiles, in particular with respect to videotapes? Did the interviews with perpetrators include people who had made videotapes? Did the interviews with victims include people who had been filmed? Had he ever actually been involved in a case in which a pedophile had made or kept an inculpatory videotape?

In the final analysis, however, and in light of the precept that searches under warrant are favored by the law, *Henderson*, 341 Or at 225, we conclude that this is not a case that requires a precise calibration of the affiant's knowledge and its underlying foundation. Creighton's knowledge is neither so obvious that it could be accepted without reference to training or experience, nor so technical that it requires elaborate detail. The explanation that he provided was sufficient to justify the magistrate's reliance. Creighton's affidavit provided facts from which the judge could issue a warrant authorizing police to search for and seize videotapes in defendant's home.[3]

Affirmed.

---

[3] Defendant does not argue that the police violated the constitution by viewing the contents of the videotapes that they seized, and we do not address that issue.